**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ISABEL GILBERT,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **09 C 7028** |
| | ) | |
| **MICHAEL ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Isabel Gilbert brings this action pursuant to the Social Security Act, 42 U.S.C. § 1381 ("the Act"), seeking judicial review of a final agency decision of the Commissioner of Social Security denying her application for Title II Disability Insurance Benefits ("DIB"). The parties' cross-motions for summary judgment are before the court. For the following reasons, Ms. Gilbert's motion for summary judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and this case is remanded for further proceedings.

**I.      Background**

**A.      Procedural History**

On September 21, 2006, Ms. Gilbert applied for DIB, alleging disability due to impairments which began on December 31, 2000. Ms. Gilbert was last insured on December 31, 2005. On December 29, 2006, the Commissioner denied Ms. Gilbert's initial claim, and on April 26, 2007, the Commissioner denied Ms. Gilbert's request for reconsideration.

Ms. Gilbert requested a hearing before administrative law judge ("ALJ") Joel G. Fina, on March 11, 2008. Ms. Gilbert and vocational expert Grace Gianforte appeared and testified at the hearing. On August 21, 2008, the ALJ denied Ms. Gilbert's request for DIB, finding she was not

"disabled" under the Act. Ms. Gilbert appealed to the Appeals Council, which denied relief on September 11, 2009.

Accordingly, the ALJ's decision is the Commissioner's final administrative decision. Having exhausted her administrative remedies, Ms. Gilbert now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

**B.     Facts**

Ms. Gilbert was born on March 6, 1946, and was 54 years old on December 31, 2000 (the date of the alleged onset of her disability). Ms. Gilbert was 59 years old on December 31, 2005, which is the date she was last insured. Ms. Gilbert was 62 years old on the date of her hearing before the ALJ. Administrative Record ("AR") at 23.

**1.     Testimony During the Hearing Before the ALJ**

**a.     Isabel Gilbert**

At the administrative hearing on March 11, 2008, Ms. Gilbert testified about her educational background, work experience, and health. She completed the eighth grade at Bryant School in Harvey, Illinois, began working at age thirteen, and never obtained a GED or advanced training, certificates, or licenses. AR at 26-27. Over the years, Ms. Gilbert worked as a cook, house cleaner, and nanny. AR at 27-30.

According to Ms. Gilbert, she has been unable to work since 2000 because of her health. AR at 28. Specifically, Ms. Gilbert has had recurrent hernias and has been diagnosed with chronic obstructive pulmonary disease ("COPD"). AR at 28-29. Ms. Gilbert testified that she first developed a hernia when she was lifting 50-60-pound cases of stock while working as a cook. AR at 30-31. She had multiple surgeries for the hernias, and in between the surgeries, swelling made it difficult for her to lift objects or bend over. AR at 43. As a result, Ms. Gilbert

could not perform household chores involving lifting.  AR at 30.  Ms. Gilbert further testified that in 2005 she experienced diverticulitis (swelling in the large intestine) and pain in her abdomen from a fistula in her colon.  AR at 32.

Ms. Gilbert testified that her COPD contributed to her inability to work.  AR at 28.  She began using inhalers in 2005, still uses them today, and has been on oxygen while hospitalized.  AR at 34.  She experiences shortness of breath and chest pains when she overexerts herself.  AR at 34.  As a result, her sister and son assist her around the house.  AR at 36.

Ms. Gilbert also testified that she experiences difficulty sleeping.  AR at 38.  Following her COPD diagnosis in 2002, she began to use three pillows in bed to help her breathe.  AR at 38-39.  She coughs and gags when she lays flat in her bed.  AR at 38.  Due to trouble sleeping at night, Ms. Gilbert takes naps five out of seven days a week.  AR at 40-41.

### b. Vocational Expert Grace Gianforte

Vocational expert Grace Gianforte also testified.  According to Ms. Gianforte, Ms. Gilbert's past relevant work included experience as a cook, a housekeeper, and a nanny.  AR at 46-47.  Ms. Gilbert's work as a cook involved prep-work, deep-frying, sautéing, cooking steaks, making soups, sandwiches, and salads, and cleaning up.  AR at 46.  Due to the variety of tasks, Ms. Gianforte testified that under the Dictionary of Occupational Titles, Ms. Gilbert's skill level as a cook would be classified as specific vocational preparation ("SVP") level five and medium in exertion.  AR at 46-47.

Ms. Gilbert's housekeeping work was unskilled and typically ranged in exertion from light to medium.  AR at 47.  Ms. Gilbert's skill level as a nanny, where she cared for three children and tended to their home, is classified as SVP four and medium in exertion.  AR at 47.

Ms. Gianforte concluded that Ms. Gilbert's work history in its entirety classifies as semi-skilled and medium in exertion. AR at 47.

Ms. Gianforte then considered the ALJ's first hypothetical question, which asked whether an individual of Ms. Gilbert's same age, education, work experience, and skill set who has the ability to perform medium work, lift or carry up to 25 pounds frequently, could occasionally lift up to 50 pounds, climb stairs and ramps, stoop, crouch, kneel, but could not crawl or climb ladders, ropes or scaffolds, could perform Ms. Gilbert's past work. AR at 47-48. Ms. Gianforte opined that the restrictions of only occasionally stooping, crouching, kneeling, and never crawling would preclude the housekeeping and nanny work, but the medium exertion level would allow for work as a cook. AR at 48. Additionally, Ms. Gianforte stated that a person with the aforementioned restrictions could perform medium exertion level jobs, such as food preparation worker, kitchen helper, and cook helper. AR at 48.

Ms. Gianforte then considered hypothetical question two from the ALJ: would adding in an additional restriction of avoiding concentrated exposure to poorly ventilated areas affect her conclusions? AR at 48-49. Ms. Gianforte responded that this would not affect her analysis. AR at 48-49. When Ms. Gilbert's counsel questioned Ms. Gianforte, she acknowledged that while kitchens are required by law to be well-ventilated, "in a real job anything can happen and food can get burnt," thus creating an environment where a person in a kitchen could be exposed to smoke. AR at 56. Nevertheless, she opined that caterer helpers, salad makers, and short order cooks all work in well-ventilated areas, although they might have a "moderate exposure" to irritants. AR at 57.

Ms. Gianforte then considered the ALJ's third hypothetical question: would an individual with the same limitations as the prior hypothetical question, but an exertion level of light (*i.e.*,

able to lift up to 20 pounds occasionally and lift or carry up to 10 pounds frequently) instead of medium be able to perform Ms. Gilbert's past work?  AR at 49.  Ms. Gianforte opined that the individual would not be able to do so.  AR at 49.  Nevertheless, she opined that Ms. Gilbert's skills would be transferable to the food services industry and specifically to the "light" positions of caterer helper (1,500), salad maker (8,000), and short order cook (4,000).  AR at 49.  Ms. Gianforte further stated that no additional skills would be required for these three positions.  AR at 49.  Ms. Gianforte thus concluded that these jobs would require minimal vocational adjustment for an individual with Ms. Gilbert's skills and limitations.  AR at 49-50.

Ms. Gianforte then considered hypothetical question four from the ALJ:  would an individual with the same limitations as the prior hypothetical question who could, in addition, not climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs, and never stoop, crouch, kneel, or crawl be able to perform Ms. Gilbert's past work?  AR at 50.  Ms. Gianforte indicated that if stooping is defined as bending the spine at the waist, then a caterer helper, salad maker, and short order cook would have to stoop or crouch on a basis of "maybe less than occasional but certainly more than never."  AR at 51-52.  She further explained that if a person was standing while performing the three listed jobs, the person would have to "bend their spine at the waist over the stove, over the table, taking items from a tray…"  AR at 51-52.  She also noted that "tables vary in heights, carts vary in heights, and a caterer is moving things from carts to a table and sometimes there's various shelves on the carts."  AR at 51-52.

Ms. Gianforte then testified that if stooping is defined as bending at the waist and reaching down to knee level or the floor, a person performing the jobs of caterer helper, salad maker, and short order cook would need to stoop to reach items on lower shelves and pull items out of the refrigerator.  She also stated that a person performing the three listed jobs might have

to crouch (*i.e.*, bend the knees and the spine) to reach items in the refrigerator.  She thus concluded that an individual who could not bend or stoop would not be able to perform the jobs of caterer helper, salad maker, and short order cook, and specifically noted that a person performing these jobs needs to be able to stoop.  AR at 52-53.

Ms. Gianforte then considered a fifth hypothetical from the ALJ:  what if a job required the ability to occasionally stoop, but not crouch?  AR at 54.  Ms. Gianforte responded that if a person could not stoop and crouch, she could not recommend that person for the positions of salad maker, caterer helper, and short order cook.  AR at 54.  Further, in response to a sixth hypothetical from the ALJ, Ms. Gianforte stated a person who could not work on a 9:00 a.m. to 5:00 p.m. basis could not perform competitive work.  AR at 54.

> ### 2.    Medical Evidence
>
> #### a.    Ms. Gilbert's Medical History Prior to December 31, 2005 (Her Date Last Insured)

Ms. Gilbert visited medical professionals on numerous occasions between 1995 and 2005.  Dr. Halpin, a doctor of osteopathic medicine (D.O.), was Ms. Gilbert's examining physician for the majority of her appointments.  AR at 226-359.  As early as 1997, Ms. Gilbert told Dr. Halpin she had abdominal pain.  AR at 237.  On July 16, 1998, after Ms. Gilbert complained of "abdominal pain and stool coming from the rectum and vagina," Dr. Halpin examined Ms. Gilbert by filling her colon with air and ultimately diagnosed Ms. Gilbert with sigmoid diverticulosis and possible diverticulutis.[1]  AR at 228.

_____

[1] "Many people have small pouches in the lining of the colon, or large intestine, that bulge outward through weak spots. Each pouch is called a diverticulum. Multiple pouches are called diverticula. The condition of having diverticula is called diverticulosis. About 10 percent of Americans older than 40 have diverticulosis. The condition becomes more common as people age. About half of all people older than 60 have diverticulosis. . . Diverticula are most common in the lower portion of the large

On July 23, 1998, Ms. Gilbert underwent a microscopic examination of her colon at South Suburban Hospital in Hazel Crest, Illinois, and remained at the hospital until July 28, 1998.  AR at 252-253.  Dr. Geetha Sabram, a pathologist, reported that the examination indicated diverticular disease and noted that a "portion of [her] intestine show[ed] extensive ulceration and acute and chronic inflammation."  AR at 252.

In October of 1998, Dr. Sanath Kumar, a surgeon, performed numerous procedures on Ms. Gilbert, ultimately diagnosing her with colovesical enteral fistula[2] secondary to diverticulitis.  AR at 344.

In April of 1999, Ms. Gilbert suffered from a hernia and had surgery to address it.  AR at 352.  Dr. Kumar's postoperative diagnosis indicated a "large ventral hernia" (i.e., an abdominal hernia) with adhesions between her small bowel and hernia sac."  AR at 352-353.

In 2002, Ms. Gilbert frequently sought medical assistance, and primarily saw Dr. Halpin. AR at 257-262.  On May 8, 2002, Dr. Halpin treated Ms. Gilbert for a varicella zoster infection[3]

intestine, called the sigmoid colon. When the pouches become inflamed, the condition is called diverticulitis. Ten to 25 percent of people with diverticulosis get diverticulitis. Diverticulosis and diverticulitis together are called diverticular disease." http://digestive.niddk.nih.gov/ddiseases/pubs/diverticulosis/#what (last visited Oct. 8, 2010).

[2] "Enterovesical fistulas (also known as vesicoenteric and intestinovesical fistulas) . . . are abnormal connections between the bowel and the bladder. The bladder is the organ in the pelvis that stores urine. The colon (large intestine), rectum (final section of the gastrointestinal tract), ileum (third segment of the small intestine) and appendix (blind ending sac extending off the large intestine) can all potentially form fistulae to the bladder. The colon is most commonly involved producing what is called a colovesical fistula . . . . Enterovesical fistulae cause symptoms of pain, dysuria (discomfort urinating),incontinence (involuntary leakage of urine) and can cause the urine to become smelly or infected."  http://www.virtualcancercentre.com/symptoms.asp?sid=54#C1 (last visited Sept. 27, 2010).

[3] "Varicella-zoster virus (VZV) is the cause of chickenpox and herpes zoster (also called shingles)."  http://emedicine.medscape.com/article/231927-overview (last visited Oct. 8,

of the left forehead and left eye.  AR at 262.  During this visit, Dr. Halpin also prescribed Amitripline, an antidepressant also known as Elavil.  AR at 262.  Ms. Gilbert saw Dr. Halpin for a follow-up on May 13, 2002, and Dr. Halpin noted that "[h]er Elavil takes a couple of hours to kick in to work, but then she gets several hours of sleep."  AR at 262.

On August 19, 2002, Ms. Gilbert returned to Dr. Halpin's office due to viral laryngitis. AR at 261.  Dr. Halpin noted that Ms. Gilbert's lungs had "some chronic faint rhonchi"[4] and "prolonged end-expiratory phase of ventilation as well as a slight wheeze on end-expiration."  *Id.*

On December 3, 2002, Ms. Gilbert told Dr. Halpin she had experienced pain, which she described as "pain in the left buttocks and the left posterolateral calf," for about three weeks. AR at 260.  Dr. Halpin diagnosed her with "left sciatica" (pain associated with the sciatic nerve) "likely due to piriformis muscle spasm" (a muscle associated with movement of the thigh) and prescribed Depo-Medrol (used to treat joint pain and swelling), Xylocaine (a local anesthetic), Naprosyn (a nonsteroidal anti-inflammatory), and Flexeril (a muscle relaxant).  AR at 260.

On December 10, 2002, Dr. Halpin treated Ms. Gilbert again and noted that she still had "tenderness over the proximal sacral insertion of the left piriformis."  AR at 252.  Dr. Halpin noted that Ms. Gilbert "cleans houses for a living and has not been able to go back to work, understandably," but also indicated that he would "probably let [Ms. Gilbert] return to work" in a week.  AR at 259.

---

2010).

[4]  Rhonchi are lung sounds caused by airway secretions or narrowing, *see* http://www. stethographics.com/main/physiology_ls_rhonchi.html (last visited Oct. 8, 2010).

Ms. Gilbert visited Dr. Halpin again on December 17, 2002. AR at 258. Ms. Gilbert's pain in her left buttocks and left calf had lasted around two months, and Dr. Halpin noted that the condition was "not better with anything I have done so far including steroid injections, Naprosyn and Flexeril." AR at 258. Additionally, after performing a physical, Dr. Halpin indicated that Ms. Gilbert's "oropharynx[5] looks normal," but "[h]er lungs are not normal. She has inspiratory and expiratory wheezes. No rales [a crackling lung sound]." AR at 258. Dr. Halpin prescribed Augmentin (an antibiotic) and an Advair inhaler (a respiratory medication that contains a steroid element, which acts as an anti-inflammatory, plus a bronchodilator). He also recommended that Ms. Gilbert "get an EMG [electromyogram] nerve conduction study of the lower extremities" and told Ms. Gilbert to stop smoking. AR at 258.

On January 6, 2003, Ms. Gilbert saw Dr. Halpin for a follow-up. Dr. Halpin noted that Ms. Gilbert had not obtained an EMG because her "pain went away" after the December 17th appointment, possibly due to Ms. Gilbert's use of Epsom salt baths. AR at 257. Dr. Halpin released Ms. Gilbert for work starting January 7, 2003. AR at 257. He noted, however, that Ms. Gilbert recently had gastrointestinal problems and needed to lose weight as her body mass index was 33. AR at 257. He thus prescribed Xenical to help Ms. Gilbert lower her body mass index. *Id*.

On May 3, 2004, Ms. Gilbert was admitted to Ingalls Hospital for abdominal pain and vomiting. AR at 174. Dr. Deshmukh performed an exploratory laparatomy (an incision through the abdominal wall) and concluded that Ms. Gilbert had an incarcerated abdominal wall hernia (a condition where a loop of intestine protrudes through an opening or area of weakness in the

---

[5] The oropharynx is "the part of the pharynx that is below the soft palate and above the epiglottis and is continuous with the mouth." http://www.merriam-webster.com /dictionary/oropharynx (last visited Oct. 8, 2010).

abdominal wall.  AR at 174-178.  Dr. Dinesh Jain also prepared a procedure report about the surgery and stated that Dr. Deshmukh removed an omentum (a fold in the membrane lining the abdominal cavity) because it was necrotic (the cells had died).  AR at 174.  Like prior doctors, Dr. Jain diagnosed Ms. Gilbert with COPD and administered nebulizer treatments.  AR at 178.

The following year, Ms. Gilbert continued to have respiratory issues due to COPD.  AR at 254-255.  On November 22, 2005, Dr. Halpin diagnosed Ms. Gilbert with "bronchitis with brochospasm" and "probably some underlying COPD."  AR at 255.  Dr. Halpin further noted that Ms. Gilbert "[was] not sleeping well."  AR at 355.  As a result, he prescribed an antibiotic medicine, as well as medications to help her breathe, including prednisone (an oral steroid that acts as an anti-inflammatory for people with respiratory issues by opening the airways) and Phenergan (an allergy medication).  AR at 255.

On December 2, 2005, Dr. Halpin saw Ms. Gilbert for a follow-up appointment.  He noted that Ms. Gilbert had a post-bronchitic cough and "still has end-expiratory rhonchi and end-expiratory wheeze, although overall all the symptoms are better" and prescribed another course of prednisone.  AR at 254.

       **b.**      **Ms. Gilbert's Medical History After December 31, 2005 (Her Date Last Insured)**

Ms. Gilbert's date last insured was December 31, 2005.  After this date, Ms. Gilbert sought medical assistance numerous times from 2006 to 2008 relating to her COPD and hernia.  AR at 319-359.  When Ms. Gilbert visited Dr. Halpin on February 6, 2007, her symptoms included poor sleep for a year, a 20 pound weight gain, and an overactive bladder with occasional urinary incontinence.  AR at 335.  Dr. Halpin noted again that she likely had COPD,

recommended that she obtain a sleep study, and prescribed medication to help her breathe.  AR at 335.

On December 14, 2007, Ms. Gilbert visited Dr. Halpin because she had been vomiting for three days, then had three days of diarrhea, and also had been "crying off and on because she fe[lt] bad."  AR at 356.  Dr. Halpin sent Ms. Gilbert to the emergency room.  AR at 356.  On December 18, 2007, Dr. Johnson performed a ventral hernia repair with mesh, which acts as a patch for the repair.  AR at 359.  After this surgery, Ms. Gilbert had a small postoperative pulmonary embolus (a blocked artery).  Thus, on January 25, 2008, Dr. Halpin prescribed Coumadin (a blood thinner) for "at least 6 months."  AR at 357-359.

### c.  State Physician Review

On December 28, 2006, a state agency doctor checked off the box next to the statement "[t]his claim is being denied for failure to cooperate or insufficient evidence" and stated that Ms. Gilbert was not disabled based on his review of available medical records.  AR at 225.  On reconsideration, on April 19, 2007, a state agency doctor concluded that "[t]he evidence is insufficient to fully evaluate the severity of the impairments on or prior to the date last insured." AR at 305.

## II.  The ALJ's Decision

To determine if an individual is disabled:

the ALJ must use the five-step sequence outlined in 20 C.F.R. § 404.1520(a). Each step must be satisfied before moving on to the next step.  First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit. 20 C.F.R. § 416.920(b).  If the claimant is not involved in SGA, step two requires the ALJ to decide whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken together, are "severe." 20 C.F.R. § 416.920(c).  Severity is measured by whether an impairment significantly limits an individual's ability to perform basic

work activities. 20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p. If such an impairment is found, the ALJ proceeds to step three.

In step three, the ALJ evaluates whether the claimant's impairment meets criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings).  If the ALJ decides in the affirmative, the claimant is disabled. If the claimant's condition is not equivalent to a Listing, the ALJ moves on to step four. Step four requires the ALJ to determine the claimant's residual functional capacity (RFC).  The ALJ considers all impairments, not just those found to be severe under step two. 20 C.F.R. § 416.945.  The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to step five, where he evaluates whether the claimant is capable of performing other work. 20 C.F.R. § 416.920(g).  The ALJ takes into consideration the claimant's RFC, age, education, and work experience.  At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy.  20 C.F.R. §§ 416.912(g), 416.960(c).  If the ALJ determines that there is other work available to the claimant, the claimant is not disabled for purposes of SSI or DIB.

*Heeman v. Astrue*, — F.Supp.2d —, No. 09-3184, 2010 WL 3239454, at *1-2 (C.D. Ill. Aug. 16, 2010).

In a decision issued on August 21, 2008, the ALJ applied the Commissioner's sequential evaluation of "disability" under 20 C.F.R. § 416.920(b)-(f) and found that Ms. Gilbert was not disabled.   Following the five-step analysis, the ALJ found at step one that Ms. Gilbert had not engaged in any substantial gainful activity from the alleged date of onset of December 31, 2000, through her date last insured of December 31, 2005.  AR at 15.  At step two, the ALJ found that Ms. Gilbert suffered from the following severe impairments:  COPD, hypertension, recurrent incarcerated incisional (ventral) hernia, status post surgery with mesh.  AR at 15.  In making his determination, the ALJ explained that Ms. Gilbert's impairments "reportedly limit her ability to lift heavy objects and ambulate effectively."  AR at 15.  The ALJ characterized Ms. Gilbert's

impairments as "severe" because "they have more than a minimal effect on her ability to perform work-related activities."  AR at 15.

At step three, the ALJ decided that Ms. Gilbert "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments."  AR at 15.  The ALJ supported his finding with the fact that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairments in 20 C.F.R. § 404(P)(1)."  AR at 16.  Further, the ALJ noted that he considered Ms. Gilbert's COPD under Listing 3.02 and found "no evidence of required FEV1 [forced expiratory volume in one second] values."  AR at 16.  Next, the ALJ pointed to the fact that Ms. Gilbert's hypertension did not "meet or medically equal any listed requirement, specifically the listings that correspond to heart, brain, kidneys and eyes."  AR at 16.  Finally, the ALJ stated that Ms. Gilbert's "recurrent incisional (ventral) hernia fail[ed] to meet or medically equal a listing."  AR at 16.

At step four, the ALJ found that Ms. Gilbert could not perform her past relevant work as a cook or cleaning housekeeper because these jobs required a medium exertional level, which exceeded her residual functional capacity.  AR at 17.

At step five, the ALJ analyzed Ms. Gilbert's residual functional capacity by considering whether she had an "underlying medically determinable physical or mental impairment" and evaluating the "intensity, persistence, and limiting effects" of her symptoms to determine "the extent to which they limit [her] ability to do basic work activities."  AR at 16.

When considering Ms. Gilbert's symptoms, the ALJ noted that Ms. Gilbert testified at the hearing that "she is unable to lift, bend over or stretch" and that "she is so limited that she is unable to independently perform self care."  The ALJ additionally noted that "she described chest pain on exertion," "described COPD symptoms, which include difficulty breathing,

coughing, chest pain and fatigue," and that he did "not doubt that [her] pain symptoms that appear throughout the record are legitimate." AR at 16.

He nevertheless found that Ms. Gilbert's testimony was not credible to the extent it was inconsistent with the residual functional capacity assessment, explaining that "the objective evidence falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis." AR at 16-17. In support, he observed that Ms. Gilbert denied "any significant medical history" when she was treated at Ingalls Hospital in May of 2004 (when she had surgery for her incarcerated abdominal wall hernia), as well as the fact that prior to her date last insured, Ms. Gilbert's medical records indicated that "she was not prescribed medication for any condition." AR at 17.

He then characterized the medical records as "sparse" and stated that while Ms. Gilbert's medical records revealed a history of hypertension and COPD, her "chest x-rays were negative," she had a successful hernia repair, and after the hernia surgery, she only sought treatment for routine matters. AR at 17. In addition, he stressed that "no treating or examining physician ever suggested the claimant limit her physical activities, particularly in the period prior to December 31, 2005." AR at 17. The ALJ also consulted the administrative findings of fact made by the state agency physicians and accorded substantial weight to these findings. AR at 17.

Ultimately, the ALJ concluded that "based upon both the objective findings and giving partial credibility to some of the claimant's subjective complaints," Ms. Gilbert retained the ability "to perform work at the light exertional level." AR at 17. The ALJ further added that "because of abdominal pain she should never climb ladders, ropes, or scaffolds or crawl and should only occasionally climb ramps or stairs, stoop, crouch or kneel." AR at 17. The ALJ also noted that Ms. Gilbert "should avoid concentrated exposure to non ventilated areas." AR at 17.

He then found that Ms. Gilbert was "an individual closely approaching advanced age, on the date last insured," had a limited education, and was able to communicate in English. AR at 18. Next, he held that Ms. Gilbert could prepare a wide variety of foods, handle lunch orders, and clean up. AR at 18.

He also determined that Ms. Gilbert's work skills could be transferred to "other occupations with jobs that existed in significant numbers in the national economy." AR at 19. In coming to this conclusion, the ALJ pointed to the testimony of the vocational expert, which indicated that a person of "the same age, education, past relevant work experience, and residual functional capacity" as Ms. Gilbert could perform three occupations: caterer helper (1,500 positions available in regional economy), salad maker (8,000 positions available in the regional economy), and short order cook (4,000 positions available in the regional economy). AR at 18.

In selecting these three positions, the ALJ relied on the vocational expert's testimony that "the light level jobs are so similar to [Ms. Gilbert's] past relevant work that [Ms. Gilbert] would need to make very little, if any, vocational adjustments in terms of tools, work processes, work settings or the industry." AR at 18. Ultimately, the ALJ conceded that Ms. Gilbert's limitations did not allow her to "perform the full range of light work" but found that Ms. Gilbert was not disabled based on her age, education, and transferable work skills. AR at 19.

## III. Analysis

### A. The Parties' Positions

Neither party challenges the ALJ's findings in steps one through four. However, their views diverge with respect to step five. Ms. Gilbert argues that the ALJ erred when he determined she was not disabled at step five because: (1) his credibility determination was improper; (2) his assessment of her residual functional capacity was flawed because he ignored

her hernia surgeries and need to nap during the day; (3) he lacked a medical basis for his residual functional capacity assessment; (4) he ignored portions of the vocational expert's testimony that were favorable to her; and (5) she lacked transferable skills acquired from her past relevant work.  In contrast, the Commissioner asks the court to affirm the ALJ's decision.

**B.**      **Standard of Review**

Section 205 of the Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, are conclusive."  42 U.S.C. § 405(g).  In reviewing the Commissioner's decision, the court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1985).  Instead, its review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether substantial evidence in the record supports the findings.  42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The ALJ's decision must be affirmed if the findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may support the claimant's argument.  42 U.S.C. § 405(g).  Moreover, a credibility determination made by the ALJ will not be disturbed unless it is patently wrong.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's conclusions of law, however, are not entitled to such deference.  If the ALJ committed an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings."  *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986).

## C.     Is Ms. Gilbert Disabled?

Under the Social Security Act, an individual is disabled if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A); and (2) "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work," 42 U.S.C. § 1382c(a)(3)(B).

Ms. Gilbert contends that the ALJ failed to properly assess her credibility and residual functional capacity, ignored portions of the vocational expert's testimony that favored her, and incorrectly found that she had transferrable skills from her past relevant work.

### 1.     The ALJ's Credibility Determination

Ms. Gilbert first challenges the ALJ's finding that her testimony was "not credible to the extent [it was] inconsistent with the residual functional capacity assessments."  In support, she argues:  (1) the ALJ failed to articulate specific reasons for his determination; (2) the determination was inconsistent with the ALJ's prior findings regarding her "severe" impairments; (3) the ALJ erred as a matter of law by relying solely on objective medical evidence in making his credibility determination; (4) the ALJ failed to conduct a proper pain analysis; and (5) the ALJ did not consider evidence regarding Ms. Gilbert's use of prescription medication.

The Seventh Circuit requires ALJs to follow Social Security Ruling 96-7p. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007). Thus, it has explained that:

> SSR 96-7p requires an ALJ to articulate the reasons behind credibility evaluations. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Id.*, *citing* SSR 96-7P, 1996 WL 374186, at *4 (S.S.A. July 2, 1996). Nevertheless, as noted above, an ALJ's credibility determination generally will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d at 435.

### a. Did the ALJ Articulate Specific Reasons Supporting His Credibility Determination?

Ms. Gilbert first asserts that the ALJ failed to adequately support his findings about her credibility. As noted above, the ALJ found that Ms. Gilbert was only credible to the extent her testimony was consistent with his view of the medical record. He also appears to have misapprehended the record when he stated that "[i]n May 2004 treatment notes from Ingalls Hospital, the claimant denied any significant medical history. According to medical records, prior to her date last insured she was not prescribed medication for any condition." AR at 17.

However, as summarized above, Ms. Gilbert's doctors prescribed numerous prescription medications prior to her last date insured, her hernia issues were ongoing (as demonstrated by her 2007 emergency hernia surgery), and multiple doctors noted that she appeared to have COPD which interfered with her ability to breathe and sleep appropriately. There is no logical bridge between the ALJ's conclusions and the record. *See Brindisi v. Barnhart,* 315 F.3d 783,

788 (2003) ("Specifically, the ALJ does not explain the weight given to the [claimants']

statements and does not support its determination with any evidence in the record.  In short, the

determination lacks any explication that would allow this court to understand the weight given to

the Brindisis' statements or the reasons for that consideration as required by SSR 96-7p.").

In addition, it is improper to reject a claimant's statements about the intensity and

persistence of pain or other symptoms or about the effect the symptoms have on the "ability to

work solely because the available objective medical evidence does not substantiate your

statements."  20 C.F.R. § 404.1529(c)(2).  The objective medical evidence appears to be

consistent with Ms. Gilbert's testimony, but the ALJ nevertheless rejected portions of that

testimony based on an incorrect summary of the objective medical evidence, since he

mischaracterized the record by stating that Ms. Gilbert had no significant medical history and

was not being treated with prescription medication.  The court thus finds that remand is

appropriate.  In the interests of completeness, however, the court will briefly address the parties'

remaining arguments.

### b.      The ALJ's Finding Regarding Ms. Gilbert's "Severe" Impairments

Second, Ms. Gilbert contends that the ALJ's credibility determination does not square

with his finding that she had "severe" impairments prior to her date last insured.  *See, e.g.,*

*Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004).  As stated above, at step two the ALJ

must determine if a claimant's impairment is "severe."  *See* 20 C.F.R. § 416.920.  If the ALJ

decides that a claimant has a "severe" impairment, he then moves on to step three, and if

necessary, steps four and five.

Because the analysis contains five steps, a claimant is not necessarily disabled merely because the ALJ finds she has a "severe" impairment at step two. Thus, the fact that the ALJ's finding that Ms. Gilbert had a "severe" impairment does not preclude him from later finding that she was not credible. *See McDowell v. Com'r of Social Sec.*, No. 08 C 1077 2010 WL 1433371, at *4 (C.D. Ill. Apr. 9, 2010) (while the plaintiff "was credible in the sense that she had a severe impairment, she was not credible on the issue of whether she was totally disabled, that is, she was not credible with respect to functional limitations" because "[s]he presented as overly defensive and qualified all answers").

### c.      The ALJ's Reliance on Objective Medical Evidence

Third, according to Ms. Gilbert, the ALJ gave undue weight to the objective medical evidence and thus improperly discounted her testimony. "Objective medical evidence" consists of "medical signs and laboratory findings." 20 C.F.R. § 404.1529(a).[6] A determination of credibility cannot rest "solely on the basis of objective medical evidence" because "symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." SSR 96-7 at *3-10.

Thus, "if an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons." *Id.* at *11. The ALJ may

---

[6] "Medical signs" are observable "anatomical, physiological, or psychological abnormalities which can be observed" and "shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

also consider the claimant's daily activities, the location, duration, frequency, and intensity of pain or other symptoms, precipitating and aggravating factors, the type, dosage, effectiveness, and side effects of medication, other measures to treat pain, and functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3); *see also* 20 C.F.R. 404.1508 ("[i]f you are not doing substantial gainful activity, we always look first at your physical or mental impairment(s) to determine whether you are disabled . . . . Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms").

Here, the ALJ found that Ms. Gilbert's testimony about her symptoms was "legitimate" but nevertheless stated:

> no symptoms or combination of symptoms can be the basis for the finding of a disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms. The objective evidence falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis.

AR at 16-17.

While the ALJ also considered factors such as Ms. Gilbert's treatment history and medication, AR at 17, his emphasis on the objective medical evidence caused him to improperly discredit Ms. Gilbert's testimony. This is an additional reason supporting remand. *See Pope v. Shalala,* 998 F.2d 473, 487 (7th Cir. 1993) ("we cannot affirm the ALJ's decision simply because the objective medical evidence may not support the extent of pain claimed by [the claimant]. Instead we must evaluate all of the evidence, including medical evidence, [the

claimant's] claims, and the evidence of her daily activities, as well as the ALJ's observations of [the claimant] herself").

### d. Pain Analysis

Fourth, Ms. Gilbert asserts that the ALJ failed to conduct a proper pain analysis. When a claimant's assessment of her pain is inconsistent with the objective evidence:

> the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ found that Ms. Gilbert's assessment of her condition was credible but unsupported by his interpretation of the objective evidence in the record. Based on this inconsistency, he was required to ask her specific questions about her pain and "investigate all avenues presented that relate to pain." *Id.* The parties disagree as to whether he did so adequately. The court will not delve into this issue, as there are alternative bases for remand, but trusts that upon remand, the ALJ will pursue this inquiry in a thoughtful way and provide a detailed summary of his conclusions.

### e. Ms. Gilbert's Use of Prescription Medications

The ALJ found that Ms. Gilbert's testimony was not credible because she "was not prescribed medication for any condition" prior to her last date insured. AR 17. Ms. Gilbert notes that she was, in fact, prescribed medication prior to her date last insured. The misstatement of the record may be harmless error if Ms. Gilbert did not take prescription

-22-

medications for at least twelve months.  *See* 42 U.S.C. § 423(d)(1)(A), *see also* 20 C.F.R. §§

404.1504 & 404.1509.  Upon remand, the ALJ shall consider Ms. Gilbert's use of prescription

medications, the length of time she used those medications, and whether her doctors prescribed

any medication that she did not take.  *See id.*; *see also McClesky v. Astrue*, 606 F.3d 351, 352

(7th Cir. 2010) (if claimant does not fill prescriptions, the ALJ must consider the reasons why

she did not do so).

### 2.    Ms. Gilbert's Residual Functional Capacity

The RFC measures "what an individual can still do despite his or her limitations" and is

"the individual's maximum remaining ability to do sustained work activities in an ordinary work

setting on a regular and continuing basis."  Social Security Ruling 96-8p.  Ms. Gilbert first

challenges the ALJ's assessment of her RFC, arguing that the ALJ did not sufficiently consider

the impact of her hernia surgeries or her need to nap during the day.  The Commissioner

contends that this argument is in fact a recasting of Ms. Gilbert's challenge to the ALJ's

assessment of her credibility.  Alternatively, the Commissioner argues that, in any event, naps

are "noncognizable" when they are not prescribed by a doctor or otherwise supported by medical

evidence and the ALJ duly considered Ms. Gilbert's hernia surgeries.  *See* Commissioner's

Response at 7.

Ms. Gilbert is entitled to challenge the ALJ's assessment of her RFC on appeal.  With

respect to her naps, as discussed above, multiple doctors opined that Ms. Gilbert appeared to

have COPD which interfered with her ability to breathe and sleep appropriately.  Moreover, in

2002, Dr. Halpin prescribed Elavil, which took "a couple of hours to kick in to work, but then

she gets several hours of sleep."  AR at 262.  The court, therefore, finds that the ALJ should have

addressed Ms. Gilbert's sleep disturbances and their impact on her ability to work.

With respect to the hernia surgeries, the ALJ stated that after Ms. Gilbert's hernia surgery, she sought treatment for "routine illnesses, however, none of which have caused any persistent limitations on her ability to engage in basis work activities." AR 17. The ALJ, however, also acknowledged that Ms. Gilbert was limited physically by "abdominal pain" and could not perform past relevant work through the date last insured because she could not perform at the medium exertional level as those jobs required. *Id.* The court thus rejects Ms. Gilbert's contention that the ALJ failed to take the repercussions of her hernia condition into account when determining her RFC.

Ms. Gilbert also contends that the ALJ did not adequately consider the medical evidence when determining her RFC and the jobs she could do. The Commissioner is entitled to assess a claimant's RFC. *See* 20 C.F.R. § 404.1527(e)(2) ("[a]lthough we consider opinions from medical sources on issues such as . . . your residual functional capacity . . ., the final responsibility for deciding these issues is reserved to the Commissioner").

The ALJ's order notes that Ms. Gilbert should avoid exposure to non-ventilated areas. Ms. Gianforte, the vocational expert, testified that a person in a kitchen could be exposed to smoke and that caterer helpers, salad makers, and short order cooks all work in well-ventilated areas, although they might have a "moderate exposure" to irritants. AR at 56-57. The court is not required to set aside its common sense when reviewing the Commissioner's determinations regarding disability. It thus rejects the idea that a short order cook working the grill or hot line in a typical casual dining establishment will not be regularly exposed to on-the-job smoke or airborne irritants. It further finds that the ALJ's opinion does not sufficiently address how Ms. Gilbert can perform these positions despite her inability to be exposed to a "moderate" amount of smoke.

The court similarly fails to see how caterer helpers, salad makers, or short order cooks could perform the basic requirements of their jobs if, like Ms. Gilbert, they could only occasionally stoop, crouch, or kneel. In a kitchen setting, food, plates, utensils, supplies, and refrigerator/freezer shelves are not all at counter-height. Moreover, the vocational expert opined that a person who could not stoop, crouch, or kneel could not work as a caterer helper, salad maker, or short order cook. No evidence in the record supports a conclusion that stooping, crouching, and kneeling to reach items below counter-height are de minimis parts of the three listed jobs. Nevertheless, the ALJ concluded that Ms. Gilbert was capable of working as a caterer helper, salad maker, or short order cook.

The record must show a "logical bridge" between the evidence and the RFC determination. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The basis for the ALJ's findings regarding Ms. Gilbert's physical limitations and his conclusion that she could work as a salad maker, caterer helper, or short order cook is not evident from his opinion. On remand, he must consider this issue.

### 3. The Vocational Expert's Testimony

Next, Ms. Gilbert asserts that the ALJ failed to consider portions of the vocational expert's testimony that favored her when he evaluated her RFC. The ALJ will necessarily have to address all of the vocational expert's testimony, including her answers to hypotheticals, when it revisits Ms. Gilbert's RFC. Thus, the court need not address this argument.

### 4. Transferable Skills From Past Relevant Work

Finally, the parties disagree regarding the ALJ's finding that Ms. Gilbert had transferable skills, such as handling lunch orders and cleaning up. The ALJ appears to have accepted the vocational expert's testimony that Ms. Gilbert's skills were transferable to the semi-skilled food

service jobs of short order cook, salad maker, and caterer helper given her past semi-skilled work as a cook, which required her to, among other things, deep fry foods, cook steaks, saute, prepare soup and sandwiches, perform prep work, make salads, and clean up.  AR at 46, 49.

"When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision."  SSR 82-41 at *7; *Key v. Sullivan,* 925 F.2d 1056, 1062 (7th Cir. 1991) ("[w]hen transferability of skills is at issue, the ALJ is required to identify the acquired work skills").  The vocational expert's testimony adequately shows that a person with Ms. Gilbert's work background has adequate skills to perform the jobs of short order cook, salad maker, and caterer helper given that these skills required by these jobs are essentially the same as the skills required by her prior job in the food services industry.  The court thus rejects Ms. Gilbert's arguments about her transferrable skills.

## IV.    Conclusion

For the foregoing reasons, Ms. Gilbert's motion for summary judgment [#16] is granted and the Commissioner's cross-motion for summary judgment [#21] is denied.  The Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this order.


DATE: October 8, 2010
       _Blanche M. Manning_
       Blanche M. Manning
       United States District Judge